IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 10, 2026

**COY J. COTHAM, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2636    Mark J. Fishburn, Judge**

_____

**No. M2025-01171-CCA-R3-PC**

_____

A Davidson County jury convicted the Petitioner, Coy J. Cotham, Jr., of first-degree premeditated murder and especially aggravated robbery, and the trial court imposed a life sentence without parole and a consecutive twenty-five-year sentence.  The Petitioner appealed, and this court affirmed the trial court's judgments. *State v. Coy J. Cotham, Jr.*, M2012-01150-CCA-R3-CD, 2014 WL 3778613, at *1 (Tenn. Crim. App. July 31, 2014). Subsequently, the Petitioner filed a petition for post-conviction relief pursuant to the Post-Conviction DNA Analysis Act, which the post-conviction court summarily dismissed.  On appeal, the Petitioner maintains that he is entitled to DNA testing of a blue towel recovered from his vehicle.  Following our review of the record, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Coy J. Cotham, Jr., Pikeville, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Procedural History**

This case arises from the August 29, 2010 shooting death of the victim, Veronica Bozza, at her home in Hermitage, Tennessee.  For his role in her death, a Davidson County

jury indicted the Petitioner for the first-degree premeditated murder of the victim and especially aggravated robbery.[1]

At the time of the victim's death, the victim and her estranged husband, Timothy Roy Bozza, were in the process of a divorce and determining custody of their son. Several months before the victim's death, the victim was awarded more time with their son, approximately 203 days, and a reduction in the amount of child support she owed Mr. Bozza. Mr. Bozza was upset by this ruling. Both the victim and Mr. Bozza were required "to carry $350,000 in life insurance, listing the other parent as the beneficiary as trustee for their minor child." *Cotham*, 2014 WL 3778613, at *8. The remaining custody issues were unresolved at the time of the victim's murder.

On August 29, 2010, the victim's boyfriend, Brian Robinson, found the victim at home at around noon, lying on the floor bleeding. He called 911, and Metro Nashville Police Department ("MNPD") officers responded. Police found a projectile on the floor next to the victim's body, a hole in the hardwood floor, and a spent shell casing on the floor next to the wall near the back door. The couch cushions had been lifted, making it appear as if someone had been searching for something. The victim sustained two gunshot wounds to her head and had gunpowder residue on her hand, indicating close proximity to the shooter at the time the gun was fired. Officers found $400 in an envelope in plain view a few feet from the victim's body and a blank check made payable to the victim from Mr. Bozza with the notation "for school fees." *Id.* at *3. Police officers collected four projectiles and one nine-millimeter shell casing from the crime scene.

MNPD detectives interviewed Mr. Bozza and determined that he was not present during the victim's murder based upon receipts and store surveillance videotapes showing that he was shopping at relevant times to the murder. Telephone records, however, reflected numerous calls between Mr. Bozza and the Petitioner on the day of the murder. Detectives developed the Petitioner as a person of interest "because it looked like [the victim's] cell phone was being used after the time of her death. And her cell phone was using towers in the locations, exactly the same point, where [the Petitioner's] cell towers were being used after the homicide." *Id.* at *4 (first alteration in original). Later, when interviewed by law enforcement officers, the Petitioner's statements about his whereabouts around the time of the murder were inconsistent with the cell phone records.

After one of the detectives assigned to the case executed a search warrant at the home of the Petitioner's mother, the detective began receiving threatening phone calls from the Petitioner, who initially tried to disguise his voice. The Petitioner told the detective

---

[1]The victim's estranged husband, Timothy Roy Bozza, also was indicted for the first-degree premeditated murder of the victim and tried separately.

2

that he knew identifying information about the detective's family, including where they lived, his son's age, and specifics about family vehicles. Later, when the detective transported the Petitioner for booking following the Petitioner's arrest in Kentucky, the Petitioner told the detective he also knew where the detective's son attended school.

Police recovered from the Petitioner's Cadillac Escalade:

a black duffel bag containing a pair of white tennis shoes, two used blue latex gloves, and a collapsible cooler containing a black Nike hat and a Condor brand black tactical sleeve, which could be worn around the head as a scarf or face mask; a pawn ticket transaction from Toliver's Pawn and Loan dated August 25, 2010; two brown towels found in the backseat; a cell phone charger with a phone connected to it; a pair of black gloves; and a blue hand towel.

*Id.* at *5.

At trial, Mr. Bozza testified that he and the victim were married for about seventeen years and shared a son. At the time of the victim's death, they had been separated for about fourteen months, and their divorce was close to being finalized. Mr. Bozza acknowledged that there was conflict with respect to their divorce and custody arrangements for their son.

Mr. Bozza said that he had known the [Petitioner] for about thirteen years and that, about ten years ago, the [Petitioner] had lived with him and the victim for a few months. The [Petitioner] left Nashville for a period of time, and Mr. Bozza next saw him at the courthouse the day of Mr. Bozza's custody hearing. They renewed their friendship, and the [Petitioner] began working for Mr. Bozza. Asked if he and the [Petitioner] had ever discussed killing the victim, Mr. Bozza replied, "Well, yes, sir. I made a bad joke one day about a movie that—in the middle of a session we were both complaining about." He said that he brought up the issue "in a moment of anger" and that it was then dropped. He denied offering the [Petitioner] $10,000 to kill the victim. However, the [Petitioner] offered him $10,000 "to take care of Laura Yancey . . . the girl who was living with husband who had custody of his son." Mr. Bozza said he told the [Petitioner] he "could never do anything like that." Mr. Bozza denied any knowledge of the [Petitioner]'s following the victim on numerous occasions prior to her death.

Regarding the day of the victim's murder, Mr. Bozza acknowledged that he talked to the [Petitioner] several times that day but said they only talked about "average bologna kind of stuff." He said he met the [Petitioner]

3

at a grocery store near St. Edward's Church, where he was waiting to pick up his son from the victim. The [Petitioner] was driving a minivan that belonged to the woman with whom he lived, Jennie. After they parted ways, the [Petitioner] called Mr. Bozza and said that "it was done." Mr. Bozza denied knowing what the [Petitioner] was referencing because they had discussed "a number of things that day that could have fit at that point in time." He later called the victim's cell phone and received a return call from the [Petitioner] about an hour and a half later. The [Petitioner] told him to stop calling the victim's phone because he had it. He asked the [Petitioner] why he had the victim's cell phone, and the [Petitioner] told him that "he had taken care of [Mr. Bozza's] problem and that [the victim] wouldn't be a problem for [him] anymore." Mr. Bozza said that a few weeks after the victim's murder, the [Petitioner] came by his mother's house and asked him for $35,000.

Mr. Bozza acknowledged that he had had numerous meetings with the police and the district attorney's office but denied telling them that he had any knowledge of the victim's murder prior to its happening. A redacted portion of his November 16, 2010 videotaped statement was then played for the jury. After the tape was played, the following colloquy occurred:

Q. (By [the prosecutor]) Mr. Bozza, you admit that that's inconsistent with what you've testified to today, is it not?
A. Yes, sir. I was taking things in a different context. But, yes, sir.
Q. You were taking things in a different context today or then?
A. No, today, sir. That is clear what was said.
Q. That's the truth?
A. Yes, sir, that's what was said.

On cross-examination, Mr. Bozza said that he accepted responsibility for the statement he made "that caused everything" but denied he was taking responsibility for planning the murder of his wife. He admitted that he lied to Detective Crumby.

On redirect, Mr. Bozza admitted that his and the victim's parenting plan required that they each carry life insurance in the amount of $350,000 payable to the other as trustee for their child. Asked about what he said in his statement as to whether he told the [Petitioner] he would give him $10,000 to kill the victim, Mr. Bozza said, "[W]hen he offered, I said, that sounds like a good plan right there, but I can't necessarily do that [the killing] myself." Asked to clarify if he meant he would give the [Petitioner] $10,000,

4

Mr. Bozza responded, "Well, it could be construed as that, yes, sir." He agreed that he "never backed off of anything" and that his statement could "[a]bsolutely" be construed as an agreement to pay the [Petitioner] $10,000.

*Id.* at *5-6.

The Petitioner's girlfriend at the time of these events, Jennifer Addington, took her husband's nine-millimeter handgun when they separated in July 2010. She stored the gun in a maroon lunchbox that she kept in her minivan. The Petitioner occasionally drove Ms. Addington's van, and at the end of July, Ms. Addington noticed the gun and lunchbox were missing. She asked the Petitioner about the missing gun, and he denied having it.

On the day of the murder, Ms. Addington was to meet the Petitioner at her home. When she arrived at around 9:00 a.m., the Petitioner was not there. Ms. Addington went to sleep, and the Petitioner woke her twice that day, the second time it was between 2:00 p.m. and 3:00 p.m. Ms. Addington recalled that the Petitioner left and returned, smelling like burning leaves. Ms. Addington and the Petitioner went to an early dinner at TGI Friday's restaurant. At dinner, Ms. Addington noticed that the Petitioner had with him a slimmer white phone than the Android cell phone he normally carried.

Ms. Addington initially lied to the police, saying that the Petitioner had been with her the entire day of the victim's murder. Before she spoke to the police, the Petitioner told Ms. Addington not to speak with the police because the police had also asked to meet with him to discuss Mr. Bozza. At this meeting, the police seized the Petitioner's phone and detained him all day. He told Ms. Addington that the police would do the same to her and that the police would tell her "all sorts of mean things – awful things about him."

The Petitioner also asked Ms. Addington to search her computer for news articles related to the victim's murder and to gather any information she could on detectives assigned to the murder investigation. When she provided the Petitioner with some information, the Petitioner asked if she had deleted everything. The Petitioner also asked her to accompany him on a trip to Barbados and told her not to use her cell phone because it was tapped.

Ms. Addington's ex-husband realized around July 24, 2010, he was missing a Hi–Point nine-millimeter handgun and filed a police report, listing Ms. Addington as a suspect. He believed that the nine-millimeter gun depicted in a photograph found on the Petitioner's phone looked like his gun. He turned over to the police shell casings that had been fired through his handgun.

5

In July 2010, the Petitioner showed one of his neighbors, John Schmahl, a Hi-Point nine-millimeter gun in a maroon lunchbox and told him he recently had purchased the gun from an individual for $350. The Petitioner called Mr. Schmahl on August 29, 2010, at approximately 12:28 p.m., as the neighbor was driving northbound on Old Hickory Boulevard, a few blocks past the interstate. The Petitioner told him that the Petitioner had just driven past him.

The Petitioner called Michael Chad Wilson, a long-time acquaintance, at approximately 2:46 p.m. on August 29, 2010, and asked how to take the battery out of an iPhone. Mr. Wilson knew the Petitioner to always possess a very distinctive Android phone with him.

Detective Andrew Vallee of the MNPD Criminal Investigations Division testified that he specialized in cellular telephone records and the analysis and mapping of those records. He analyzed call detail records for the victim, Brian Robinson, Jennifer Addington, and the [Petitioner]. Using the PowerPoint presentation he created, Detective Vallee explained his findings regarding the day of the victim's murder. Because the 9-1-1 phone call was received at 12:30 p.m., he reviewed the victim's cell phone records to determine what calls were made prior to that time. The victim called Brian Robinson at 11:51 a.m., which lasted eight minutes and started with tower 3099 near St. Edward's Church and ended at tower 3108 near Interstate 40 and Stewart's Ferry Pike. She next made a thirty-three-second call at 12:01 p.m. to her sister, and that call started at tower 3108 and ended at tower 3537 located at Interstate 40 and Old Hickory Boulevard. The last phone call prior to the victim's death was made to Garnett Jagels at 12:07 p.m., with the victim's phone again connecting to tower 3537. Detective Vallee said that the most direct route from St. Edward's Catholic Church to the victim's residence was about a fifteen—to twenty-minute drive. The victim's call pattern showed that when she was at home, she connected with AT & T tower 3035, which was the closest tower. Mr. Bozza called the victim's cell phone at 1:48 p.m., connecting to antenna 3037 which was located 1.8 miles from Addington's residence. At 1:49 p.m., the victim's cell phone received a voicemail notification, which connected to AT & T antenna 3037. The voicemail was accessed at 1:50 p.m. There was no activity on the victim's phone from 7:40 p.m. that day until August 31 at 10:53 a.m. when her phone transmitted data and connected to AT & T antenna 3150 near the Waste Management Nashville transfer station located at 1428 Antioch Pike. At 1:44 p.m., her phone again transmitted data from AT & T antenna 3077 near the Waste Management Landfill in Camden, Tennessee. Detective Vallee said that the victim's cell phone was likely thrown away, went to the

6

Nashville transfer station on Antioch Pike, and then was transported by garbage truck to the landfill in Camden.

Detective Vallee said that they had information indicating that Mr. Bozza was at Holt's Cee Bee in Ridgetop, Tennessee, at the time of the victim's murder. After analyzing Mr. Bozza's phone records, Detective Vallee learned that Mr. Bozza called the [Petitioner] thirteen times on the day of the victim's murder, seven times prior to her murder and six times afterwards. He then requested the [Petitioner]'s phone records, which showed that between 10:46 and 11:05 a.m. on the day of the victim's murder, the [Petitioner]'s phone was connecting to Verizon antenna 531, near Jennifer Addington's residence. At 11:14 a.m., the [Petitioner] called Mr. Bozza, connecting to Verizon antenna 139 near Briley Parkway and Lebanon Pike. From 11:29 to 11:43 a.m., there were five calls between the [Petitioner] and Mr. Bozza, all connecting to Verizon antenna 61 near St. Edward's Catholic Church. The [Petitioner]'s cell phone also connected to a Wi–Fi access point near the church at 11:54 a.m. The next activity on the [Petitioner]'s phone was at 12:20 p.m., when he made a ten-second call to Mr. Bozza that connected to antenna 117, followed by another call at 12:22 p.m. that lasted 102 seconds and began with antenna 116 and ended with antenna 113. Antenna 113 was less than a mile from the victim's residence, antenna 117 was 3.06 miles, and antenna 116 was 5.14 miles. The next call placed on the [Petitioner]'s phone was at 12:28 p.m. to John Schmahl that began with antenna 24 and ended with antenna 139. At 12:39 p.m., the victim's cell phone received a text message from antenna 3052, which was located near the intersection of Interstate 40 and Spence Lane. The next activity on the [Petitioner]'s phone was from Verizon antenna 531 near Addington's house and included a 12:51 p.m. call from Mr. Bozza, a 2:24 p.m. call to Addington, and a 2:28 p.m. call from Addington. At 2:45 p.m., the John Schmahl called Chad Wilson, first connecting to antenna 531 and ending with antenna 141 located at the intersection of Interstate 40 and Interstate 24. Between 3:15 p.m. and 3:23 p.m., the John Schmahl's cell phone was connected to an antenna in the Hickory Hollow Mall area near TGI Friday's restaurant. The [Petitioner]'s phone also showed a Wi-Fi connection access point near the restaurant. Jennifer Addington's call activity showed that she connected to the antenna near TGI Friday's at 3:19 p.m., which corroborated her statement to the police.

Detective Vallee said that further analysis of the John Schmahl's call detail records showed that a Wi–Fi access point near the victim's house was logged on the [Petitioner]'s phone at 6:13 a.m. on August 26, 2010, three

7

days before the victim's murder. The [Petitioner] called Mr. Bozza that day at 6:32 a.m. and talked for seven and a half minutes.

*Id.* at *10-11.

On September 2010, the Petitioner was arrested in Glasgow, Kentucky at Brenda Pittman's residence. Ms. Pittman's computer was confiscated and turned over to a forensic examiner, for analysis.

> Detective Gish testified that he analyzed the [Petitioner]'s Android cell phone and recovered numerous photographs. One photograph dated August 2, 2010, was of a nine-millimeter pistol with a loaded clip lying next to it. Another photograph dated August 13, 2010, was of a mattress with what appeared to be bullet holes. Detective Gish also recovered a text message Ms. Pittman sent to the [Petitioner] at 8:57 p.m. the day of the victim's murder that read, "I am so happy for you . . . it's great when a plan comes together . . . ." His analysis of Ms. Pittman's computer showed she had sent emails to an address, bigmansixnine@gmail.com, associated with the [Petitioner]'s phone. One email dated August 19, 2010, ten days before the victim's murder, included attachments containing information on Barbados and processing times for passport applications. Another email dated September 17, 2010, included an attachment listing countries that do not have extradition treaties with the United States.

> . . . .

> TBI Special Agent James Russell Davis, II testified that he tested numerous items of evidence for gunshot residue. He found gunshot primer residue on the blue towel and the Condor tactical sleeve recovered from the [Petitioner]'s vehicle. The residue particles contained tin and zirconium, which was unique. He analyzed the shell casing recovered from the crime scene and found that it "also had the elements tin and zirconium." Agent Davis explained that this was the first time he had seen zirconium in gunshot residue and that the shell casing was an import, apparently manufactured in Russia.

> . . . .

> Dr. Laura Boos of the TBI Crime Laboratory Serology DNA Unit testified that she performed DNA testing on the blue latex gloves, blue hand towel, lunchbox cooler, and tactical sleeve recovered from the [Petitioner]'s

8

vehicle. The items contained a mixture of genetic material from more than one person. She obtained a limited DNA profile, which was consistent with the [Petitioner], from the latex gloves. She was able to exclude the victim, Mr. Bozza, and Brian Robinson as contributors to the mixture found on the gloves. She also was able to exclude Mr. Bozza and Mr. Robinson as contributors to the genetic material on the blue towel but was unable to exclude the [Petitioner] and the victim as potential contributors. The towel was sent to another laboratory for further testing. From the limited profile she obtained from the lunchbox cooler, the [Petitioner] could not be excluded as a contributor, but the victim, Mr. Bozza, and Mr. Robinson were excluded. The major profile on the Condor tactical sleeve "completely match [ed]" the [Petitioner], and she was able to exclude the victim, Mr. Bozza, and Mr. Robinson as contributors. On cross-examination, Dr. Boos acknowledged that she did not find the [Petitioner]'s DNA on any of the profiles obtained from the crime scene or underneath the victim's fingernails.

Jennifer Smith, a DNA analyst with Orchid Cellmark Laboratories, testified that she examined the blue towel, using a different technique than most other laboratories, and found that the "major DNA profile present on the side of the towel without writing originated from [the Petitioner]." The victim and Mr. Robinson could not be excluded as minor contributors, and no conclusion was reached regarding Mr. Bozza.

TBI Agent Steve Scott, assigned to the Firearms Identification Section, testified that he examined a nine-millimeter cartridge case and four nine-millimeter bullets recovered from the crime scene. The bullets had a copper steel mix, which was "a little bit unusual" and consistent with a Russian-made ammunition. He compared two cartridge cases shell casings found on the property in Ethridge, Tennessee, to the cartridge case recovered from the crime scene and determined they had been fired in the same firearm. Characteristics most common to firearms manufactured by Hi-Point were present on all three cartridge cases. Agent Scott identified the gun and magazine depicted in a photograph recovered from the [Petitioner]'s cell phone as a Hi-Point semiautomatic pistol. The shell casing recovered from the crime scene had the same green coloration as the top cartridge case in the magazine.

*Id.* at *11-12

After hearing this evidence, the jury convicted the Petitioner of first-degree premeditated murder and especially aggravated murder, and the trial court imposed a life

sentence without parole and a consecutive twenty-five-year sentence. The Petitioner appealed, and this court affirmed the trial court's judgments. *Id.* at *1.

The Petitioner filed a post-conviction petition, asserting that he had received the ineffective assistance of counsel. The post-conviction court found that the Petitioner's attorney had not rendered ineffective assistance, and this court affirmed the post-conviction court on appeal. *Cotham v. State*, No. M2017-02031-CCA-R3-PC, 2019 WL 3281195, at *11 (Tenn. Crim. App. July 22, 2019), *perm. app. denied* (Tenn. Dec. 4, 2019).

The Petitioner then filed a petition requesting post-conviction relief pursuant to the Post-Conviction DNA Analysis Act. The post-conviction court summarily dismissed the petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends that he is entitled to relief pursuant to the Post-Conviction DNA Analysis Act because the post-conviction court should have ordered testing of the blue towel under newer testing procedures. He acknowledges that the blue towel has undergone DNA testing twice, but he requests for the first time in his brief a newer testing standard established in 2017. The State responds that the trial court properly determined that new DNA testing had no reasonable probability of changing the outcome at trial. We agree with the State.

The Post-Conviction DNA Analysis Act allows for defendants convicted of certain homicide and sexual offenses to request post-conviction DNA testing at any time. T.C.A. § 40-30-303. The post-conviction court, after allowing the prosecution to respond, must order a DNA analysis if it finds each of the following:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304.

10

In addition, the court may order DNA analysis if it finds "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction" and the petitioner has satisfied requirements (2), (3), and (4) listed above. *Id.* § -305. Under both the mandatory and discretionary provisions, the petitioner must satisfy all four requirements before the court will order a DNA analysis. *See Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011). Failure to meet any of the four criteria is fatal to the action. *See Buford v. State*, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003), *no perm. app. filed*.

On review of the denial of a petition, we afford "considerable discretion" to the post-conviction court's decision. *Rucker v. State*, No. M2018-00987-CCA-R3-PC, 2019 WL 325046, at *4 (Tenn. Crim. App. Jan. 23, 2019), *no perm. app. filed*. We will only reverse the post-conviction court where its judgment is "not supported by substantial evidence." *Id*.

The post-conviction court, in denying the additional DNA testing, found:

> The Court of Criminal appeals has already upheld Petitioner's conviction, ruling that there was sufficient evidence to support this conviction. The evidence the court focused on consisted primarily of cell phone records and the testimony of a codefendant, with no mention of the blue hand towel. Petitioner's claim that the hand towel was the "linchpin in the State's case against the Petitioner" is unfounded. No reasonable probability exists that Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis.

Here, the Petitioner has failed to establish that a reasonable probability exists that he would not have been prosecuted or convicted if exculpatory results were obtained through DNA analysis. The role of the blue towel in the prosecution was minimal. The co-defendant's testimony about his relationship with the Petitioner, the motive for the killing, the cell phone evidence, and the Petitioner's access to his girlfriend's pistol is significant evidence upon which a jury could find the Petitioner guilty. Given the nature of the evidence and witness testimony, we cannot conclude that Petitioner would not have been prosecuted even if exculpatory DNA evidence related to the blue towel was available. *See* T.C.A. § 40-30-304(1). The Petitioner does not offer any explanation for how this evidence would prove his innocence considering the remaining evidence. Accordingly, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction DNA analysis. We affirm the judgment of the post-conviction court.


_____s/ *ROBERT W. WEDEMEYER*__
ROBERT W. WEDEMEYER, PRESIDING JUDGE